Case number 13-1441, United States of America v. Jean Toviave, oral argument is not to exceed 15 minutes per side. Mr. Kelleher for the appellant. Morning, your honors. The adage, bad facts make bad law, sums up the prosecution and conviction of Jean-Claude Toviave. Abusive and dictatorial, Mr. Toviave mistreated perhaps the most vulnerable demographic, children living away from their parents in a foreign country. It was this backdrop that caused Miranda to be eviscerated and for a federal crime of child abuse to be created. This is the bad law spawned by this case's admittedly bad facts. While we have not shied away from Mr. Toviave's misconduct, the prosecution has scrupulously avoided the precedent, the dangerous precedent, it is attempting to set. Nowhere is this evasion more glaring than on the Miranda issue. Six points bear this out. First, the prosecution cannot even bring itself to cite the critical colloquy between Toviave and Detective Boivin in its brief. Second, the prosecution omits the suppression testimony and instead uses Ficklin's after-the-fact trial testimony. This renders the prosecution's analysis unreliable. The suppression ruling is the subject of this appeal and Ficklin's testimony was never before the district court when it's made its suppression ruling. Third, the prosecution ignores that Detective Boivin never told Toviave he was free to leave during the interrogation or that he would not record the conversation or would shut the recorder off. Fourth, the prosecution downplays Detective Boivin's instruction that Toviave still had to talk to Inspector Ficklin, even if he wanted counsel. Boivin's you're still going to talk remark consumed our opening brief. But like ships passing in the night, entire sections are disregarded as the prosecution limits our argument to Simpson v. Jackson. Thus, having ceded Toviave's other points, the prosecution in effect throws itself on the mercy of the court. Fifth, the prosecution's singular reliance on Simpson v. Jackson is flawed. It argues Boivin's remark that you're still going to talk, quote, is permitted under Simpson because it's true. So in other words, any time a suspect is told, for example, the sentence of the crime is 20 years, that would not violate Miranda because it's true. Counsel, what did your client say that you feel should be stricken? I would say everything, Your Honor. But specifically, he did concede to hitting, I believe, all four of the children. I know at least three of the children he said by name he struck at various points. He also explained why he abused the children, why he hit them. But essentially, it's a confession, I would argue. But did he stipulate to the previous crimes that he committed? As far as the tax evasion? Well, and bringing the children over. Yes, Your Honor. So if the children testified to what he stated, you would have no proof to contradict that, would you? Well, Your Honor, the children did testify to the abuse. And obviously, that's damning testimony. However, as we state in our briefs, a conviction that's based even in part on an involuntary confession violates due process. And this confession was not simply peripheral. This was central to the prosecution's case. I recognize that the children's testimony was the main focus. But Detective Boivin and Inspector Ficklin repeatedly, during their trial testimony, spoke about what Mr. Toviaf said to them and that he confessed. So this was certainly critical to the prosecution's case. I'll admit they did have other evidence, but again, coming from the horse's mouth, so to speak, this was very damaging to Mr. Toviaf. What's your thought about the request for counsel? I mean, that's supposed to be clear, and I take it you think it is. Your Honor, admittedly, it's probably not as clear as I would like it to be. If Mr. Toviaf had said, you know, I've called this attorney, you know, John Smith, that would certainly be clear. Admittedly, it's not the most unambiguous request. But on the second prong or the second element of that issue, the case law says that if an ambiguous request is made and an answer by law enforcement essentially dissuades the suspect from clarifying that request, that runs afoul of the Fifth Amendment and Miranda. And we make that point in the brief that, okay, maybe the language, when can I use this language, is not a clear request for counsel. When can I use this attorney, is that what you're saying? Yes, well, when can I use this language? That's what Mr. Toviaf said. It's not the most clear request for counsel. However, it's Detective Boivin. This is the point we made in the brief. It's far less clear than these other cases where it didn't suffice. I'll admit that, Your Honor. But the problem we have, not so much the language that Mr. Toviaf used, it's the answer. And it's the answer that Detective Boivin gave, which shows that this waiver was not voluntary. And that's the answer, you're still going to talk to Inspector Ficklin. Is that true? I would say no, Your Honor. I mean, he was there to talk to Inspector Ficklin. And that goes to the point of why he was there in the first place. I don't want you to interrupt too much. But just before he says that, he says you can use it right now. Right. Boivin says you can use it right now. You could. And then he says that you're going to talk to Mr. Ficklin. Right. You can use it now. I mean, it's all one statement. You can use it now. You're still going to talk to Inspector Ficklin. So essentially, even if he wants an attorney or is thinking about it, he still is going to talk. Before this attorney is brought to him or that arrangement is made, he still has to talk to Inspector Ficklin. And the Fifth Amendment applies to civil and criminal proceedings. As we make clear, the United States Supreme Court in Kastegard, the United States, says that the Fifth Amendment, privilege against self-incrimination, applies to criminal and civil proceedings. And this point is completely disregarded by the prosecution. We cited this case in our opening brief, and the prosecution makes no mention of that. The additional point is this questioning did not occur over the phone, did not occur at Mr. Tovio's home. This is not a case, and I've read a number of cases, where the interrogation or the discussion takes place over the phone or at a suspect's home, and that's not considered custody. That's not considered interrogation. And the irony is here, they had this gentleman's information. They had talked to him on the phone. They could have arranged to have this meeting over the phone, and in that regard, the prosecution's case would be much stronger. But they deliberately lured him to a government building, to an unfamiliar. You went there voluntarily, didn't you? Yes, but that was to pick up papers. This was all about the papers. And again, the prosecution completely disregards this whole point. Inspector Ficklin told Mr. Tovio that he had to come and get papers. Very innocuous, very harmless sounding. He goes to get them. She says, nothing that you're going to be interrogated, nothing that you're going to speak to an armed detective for two hours in a small room, none of that. So this was a ruse, and that's the problem with this, is that this was a ruse that they brought him. That ruse would be more effective, from your perspective, if he didn't feel free to leave, if he was forced to stay. He wasn't forced to stay. So if you're calling this a bait and switch, as soon as he realized the switch had happened, he could leave. Well, I would respectfully disagree in the respect that Mr. Tovio said he testified at the suppression hearing that he did not feel free to leave. He was in a small room. That's not the test, right? Well, that's part of the test. It's a totality of circumstances, and it's what a reasonable person would feel. And very briefly, he was brought in, again, for paperwork. Then he's brought into this government building, brought into an area that's electronically monitored, brought into even what Detective Boydman says is a small room, and the door is locked. Excuse me, the door is closed. There's three government employees. Detective Boydman has his gun. He has a tape recorder. He says you're still going to talk to Ms. Ficklin, regardless of whether you want counsel or not. So these are all circumstances that a reasonable person would not feel free to leave. Additionally, Detective Boydman told, again, what I would describe as a botched Miranda warning, told Mr. Toviab that his cooperation would benefit him and essentially was saying that if you talk, we're going to try and help you out. So, again, it's the total picture. Mr. Calhoun, you used most of your time on the Miranda issue. Can you address whether this is forced labor or not? Yes, Your Honor. Like Miranda, there are serious implementation problems with the prosecution's position. There is no decision applying Section 1589 to a familiar arrangement or domestic arrangement. And while the prosecution has said round and round, we've gone round and round that this is not a family and these are not family members, it's simply not the truth. These are relatives, they're related by blood, and they may not have been a family, but they were family. Are all of them related by blood? Three are related to Mr. Toviab and one is related to Helene by blood. So they were all related to either Mr. Toviab or Helene. How would you distinguish the situation where somebody brings in an au pair or something like that and then basically forces them to be a house servant? That situation, Your Honor, is completely distinguishable in the sense that How, is what I'm asking. in the sense that these children were brought for a better education and they got it. So it's an underlying purpose that keeps something from being labor? I'm trying to get at what the limiting principle is here, Your Honor. They were in school or studying literally from 5 in the morning until they went to bed at night, five days a week. I admit this was That didn't give them much time to do all the cleaning and washing and chores that the testimony shows that they had to do. Precisely. They did that at midnight or what? No, they did it on Saturday. So I concede it's admittedly an overkill approach to academics, but that's what it was. And there was literally no time to do work. How about the babysitting? There are sporadic instances of babysitting. Not all of the children, specifically Kasawa. She said she did not do any work outside of the chores. So as far as the forced labor count, at least as to Kasawa, and we pointed this out in the brief, and again the prosecution disregards it. You're saying there's no forced labor as to all of them? That's correct, Your Honor. I'm trying to get at the theory for that. It has a certain appeal, but I'm trying to get at what kind of line we would draw that wouldn't allow future oppressors of children to get out of the federal forced labor statute. I agree, Your Honor, and I understand. What would the limit be? Well, I would say the limit would be one babysitting job per week. To be honest, the problem is there's no cases like this at all. Question this way. Would you concede you lose if there was no family relation? So everything else is the exact same, but they're not relatives. I wouldn't say we lose. I would say my case would be more difficult, but I would concede that. But the fact that I think that the turning point or the critical fact is that they were not doing work. They were studying virtually 24 hours a day. And I'm not saying that that's not strange. I'm trying to get the benefit of local parentis this type of concept. Shouldn't you be required under the state you're in to establish a guardianship or something? Yes, I agree with that. That doesn't happen here. That's true, Your Honor. And that is because I believe because of the dubious immigration status of the parties, they probably did not want to bring more attention to themselves. But I agree that it would have been more helpful for me if there was a guardianship. But, again, these parents, they were related to Mr. Toviav. Mr. Toviav, while the children were in Michigan, he went to Africa and stayed with these children's parents for a month. Helene stayed with the children for seven months in Africa. So this is not a random four people randomly plucked from obscurity. These were family members. There's a tradition to help other family members, and that's what this was about. How do you tie that to the words forced labor? I would say that this is not forced labor because forced labor, and if I can quote the committee reports of 1589, it's, quote, to combat severe forms of worker exploitation. And this simply with sporadic instances of babysitting is not enough under the statute. So it's not exploitation if it's incidental to another kind of relationship. Is that the idea? Yes, Your Honor, and they were on some instances paid. Mr. Toviav also essentially provided, put a roof over their head, gave them food. Yeah, but slave drivers do that. That's true, Your Honor. I fully concede his conduct was abhorrent.  And just, you know, that's his dictatorial way of doing things. Thank you, counsel. All right, I appreciate it, Your Honor. Good morning. May it please this honorable court, Molly O'Rourke on behalf of the United States. Your Honors, the jury in this case was unanimously convinced that the testimony they heard established beyond a reasonable doubt that the defendant knowingly used beatings, starvation, psychological coercion to break the four victims in his household and compel hard labor from them. The question before this court is whether that finding was so insupportable as to fall below the threshold of bare rationality. And it was not. This court should affirm the jury verdict because there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt. Maybe this case turns on what the forced labor statute means. I think that's accurate, Your Honor. The forced labor statute. That's a point of law. As a point of law, the forced labor statute is, one, quite broadly written. It was legislated under Congress's powers under the 13th Amendment to abolish all badges and incidents of modern-day slavery. And what the statute is intended in its very broad scope is to capture not only domestic work. The statute specifically mentions child care, nannies, work that does occur inside the home. But nowhere in the statute does it preclude criminal liability for parties that may have a familial or an intimate relationship. Does it apply to just straight-up parent-child relationships? Is that the same for a father? Is this just the way this fellow did? Would the statute apply? As written, there's nothing in the statute that would preclude such criminal liability if the link between either the use of force or coercion or threats of force, the link between that use of force and labor. I thought psychological coercion was sufficient. It's not? It is. It doesn't have to have use of force. You can just speak with commanding voice and they don't know what will happen to them. That would be enough, wouldn't it? I think that the psychological coercion on its own would be sufficient. But the psychological coercion, I would argue... If it's sufficient, then I'm wondering about, and it doesn't matter whether you're a parent or not, I'm wondering about someone who tells his children to take out the garbage and make the beds. Is the only protection against going to prison for some parent who does that just the discretion of the prosecutor? No. So if you had that case, we would throw it out? If that case was strictly a parent requiring, as you said. Well, with force. Cycli, you know, the kid doesn't know what's going to happen. Might lose his privileges, might get spanked, might not get the car keys, might think that the boogeyman will come. Who knows, depending on the age of the child. And so the child is forced, in the sense that you said is sufficient, right? Correct, Your Honor. To do chores. To do chores that are work, that you could pay someone to do. Like make your beds, do the dishes, and carry out the garbage. That's a federal crime, is what you're arguing, right? The intent of Congress... Yes or no? As that particular instance that you described, I do not think would fall under forced labor. And I want to know why not. Because that type of requirement between a parent and a child to take on... But you say it doesn't make a difference whether it's a parent or a child, right? The statute does not make that distinction. I think that what you're getting at is... In this case, you would still find a violation if it was a father-child relationship. Under the facts as the testimony established, yes. Because of that strong link between either force or an extreme climate of fear or the threat of force, where the child feels that they have no choice. That's just absurd. I mean, why isn't that just child abuse statutes? What state is not going to enforce that? And, you know, this statute was enacted against a backdrop of loco parentis. No one thought they were regulating the parent-child relationship. I don't think that this statute would necessarily be precluded if the parent-child relationship rose to the level that Congress contemplated of the extreme use of force, of psychological coercion that rose to a certain level. Certainly it's not... Counsel, with respect, I thought the whole idea was it didn't have to be extreme force, that it could be psychological coercion. Is that not right? That is correct, Your Honor, but we're talking about... Then you say that you have to use this kind of force to coerce this kind of labor. That's what the statute says, right? Correct. So to say we're talking about what kind of labor, you're saying it's a great amount of force. It's not a connect. I think that the degree contemplated by both force and by the psychological coercion that would rise to the level contemplated by the statute is something more extreme, certainly, than requiring the garbage to be taken out or privileges to be... But what if they use extreme force to require ordinary chores? Or what if they use extreme force just to say to get up in the morning? You have to get up in the morning, make your bed, and go to school, and you have to make a sandwich for your lunch on your way. And we're going to beat the heck out of you if you don't. And forced labor applies to studying, all these mandates that they study. But even apart from that, what about my example? You, 8-year-old child, will get up at 6 a.m., will make your bed, make a sandwich, and go to school. That hardly can seem to be forced labor, but you're saying that would become forced labor if it was enforced with brutality. Is that right or wrong? Real bad brutality. We'll beat the heck out of you if you don't do those three things. Is that forced labor? If I may, are we talking about... Either way, if you're going to ask, is it a family or not, I'll say, okay, A, under family, B, under not family. I think the question would be closer, certainly, in your situation, but that's not what we have here. That's not my question. I'm trying to get... We rule for you, headline, New York Times, all children in America covered by the 13th Amendment. I mean, that's just a really big deal. But if we were to take your argument to the next logical step, then forced labor or forced sex trafficking would be precluded where a husband traffics his wife through forced fraud or coercion, or a cousin traffics his cousin as a minor. So you've got to draw the line somewhere else, right? I'm sorry? So you have to draw the line somewhere else, but I can tell you what I'm concerned about. I'm not sure about my colleagues. I'm concerned about saying that all of the parents in America who responsibly discipline their children and make them do chores are engaged in a federal crime, and the only thing that's protecting them from going to jail is the grace of the government not to charge them, because it doesn't matter whether you're a parent, and it doesn't matter how hard you're forcing them. So you may be forcing them not very hard, but you're forcing them to do labor, and that's labor that you could have someone pay for, and so although it's de minimis, it's still a federal crime. Is that the government's position? No, Your Honor. Well, what is then? I think that what is missing from your scenario are two things. First, here, this is not a typical parent-child relationship. So the fact that they're a family, though. And the difference is that he's beating them. A very distant relationship. Two of the children had never met the defendant before they even moved to the States. One had seen him on a handful of times, and what we're talking about is a distant cousin relationship. And cousin, I think, in the tribal community in Togo, from which these children came from, is a much more looser concept. Two of them had never even met him before. Also, even if there was some sort of guardianship, there was no evidence of a legal guardianship or a quasi. . . The way you're arguing this suggests that you think there should be an exception for family. Then this case just becomes, is it within or without? My point is that the statute draws no line between forced labor. . . There are a lot of U.S. Supreme Court cases that say if Congress is going to occupy a field that the states have regulated for a long time, child abuse would be one of them. You have to speak clearly. And forced labor doesn't speak clearly to the family relationships. I'm not saying that this could not be a case where child abuse would lie. What I'm saying is that the statute contemplates a closer link. Like in D.M.S.C., where the defendant was also prosecuted at the state level for child abuse and then was also prosecuted by a federal sovereignty for involuntary servitude because of the level of coercion and force that was used and because there was no reason why. . . There was no parent-child relationship, certainly, but not even any legal guardianship. Let's take an example, and this can't be too unusual in the United States, and the only reason I raise it is just to put all this whether you're a guardian aside. Let's say you're in a ghetto community or a poor, distressed community and the parents are in jail or drugged out or absent and the neighbor or the aunt who isn't really an aunt but is called an aunt takes these children in, in my hypothetical, and disciplines them. Says, OK, there's a new regime here. You're going to go to bed at 8 o'clock, you're going to get up at 8 o'clock, you're going to make your bed, you're going to take out the garbage, and you're going to wash the dishes, and you're going to go to school. And I know I'm not your real aunt, but I'm doing this. Now most people would say that's a golden-hearted movie script of a wonderful person, but you seem to be saying that's a federal crime. That's my problem. You can't say, well, they're really a, I mean, in my hypothetical, they're not related at all. I don't think that that's a case necessarily where forced labor would lie. But I want to know what the line is, because this seems distinguishable from that in one really key way, and that is that it's brutal. Is there any other distinction? Because the fact that it's brutal doesn't make it forced labor. It just means that it's enforced brutally, and that's child abuse. The situation that you're talking about contemplated tasks that need to be done in a household. This is a case. Maybe it's a rich neighbor, and she could afford to have a nanny come in and do it. Or maybe you're requiring your privileged child to clean his room and to take out the trash to instill those types of values that you're talking about. What we're talking about here and why this case was brought by our office and why this does lie within forced labor is because the labor performed, the labor compelled from these four youngsters went far beyond what was required to maintain the household. And it exclusively, on many occasions, benefited the defendant. To characterize the evidence, as appellee counsel did, that this was just studying with some housework on Saturday is not an accurate characterization of the record. Much of the labor that was forced on these children exclusively benefited the defendant. They laundered his clothes. They scrubbed his bathroom with bleach. They babysat his children. They babysat the children of his girlfriend, the seven children of his girlfriend. They cleaned up and served and cooked for his guests. Now, they weren't allowed to have guests. They weren't allowed to leave the home or to call anyone. But all of this labor, they left the home to go to school, correct? And they left the home on certain isolated occasions where they were with people that the defendant had in his life with whom he had to perpetuate this fake family, like his girlfriend or their tutor. Now, also, the fact that they went to school was required, essentially, not only because the testimony showed that the agreement was between the parents of the children that they would be sent to school, but if also these children were not in school, it would raise suspicions because of the community and the situation which they lived in. The tutor was a person who also believed that this was a family, so the two outings with the tutor supported that fraud. So you're saying the defendant didn't really want them to get an education? Why was he so tough on the homework stuff? I think he was, well, the testimony was that this homework was really an implement to control them and to break them. They were required to do it even when they got A's, and even when they were not at that point in the workbook. Now, of course... Go to Harvard and interview a bunch of people, and I'll bet you'll find that they had a lot of parents that were doing a lot of these things. But even if they're, I agree, that that could have been a tool to better education, but to beat a child for writing the homework down in a notebook that's lined as opposed to unlined is simply a means of coercion to get them under your control and to break them, and all the while benefiting from the labor that they did when they were not doing their homework. He didn't beat them in that case for labor. He beat them because they did something wrong in school, didn't he? Correct, but there's no... The statute doesn't contemplate a direct one-for-one in that the housework that they did had to be done while the defendant was holding the broomstick or the ice scraper that he used to beat them. The fact that there was random indiscriminate violence or random beatings or tools that were meant to control them and not let them be outside and play like a normal parent would allow their child, that created this incredible climate of fear, and that's the distinction... It would be normal children whose kids were here legally. Correct. You would think that a parent whose kids were here illegally and might give away that they were here illegally might be told to stay indoors. Correct, they would be, as well as to not... Certainly they were... That wouldn't be necessarily in order to force labor. That would be in order to avoid deportation. Well, I think it's part of a larger scheme that this defendant had in mind, certainly. They were not allowed to tell anyone where they came from. When Child Protective Services interviewed... I imagine most illegal immigrants tell their children that, don't you think? Well, I would suppose so, but certainly the person who is responsible for bringing them over here illegally has an interest in keeping that under wraps. Jeb Bush says that's an act of love. There was no act of love in this household. There were beatings, there was coercion, there was labor that benefited the defendant exclusively, and it's that type and degree of force and coercion and the type and degree of household labor and labor outside of the home that rose this case, that makes this case subject to a federal prosecution. Certainly, if the facts were different, our office would not have brought this case. Right, but could it have been brought if the facts were different? I think... From another office that wasn't as generous and thoughtful as yours. I think that the statute is broadly written. There's nothing... So this is just, that's what I'm saying, this is just the grace of the prosecutors. No, I think that the statute in its... The limit is... But I'm still curious what the limit is. Are you saying that there are some things that aren't forced labor even though they are forced and they're labor? It just has to do with how much it's related to the benefit of the parents? No, it's a degree of... It's a degree thing. Well, yes, it is a degree, that there be not just the requirement of household chores, because this went beyond that. There not just be the requirement of some kind of light psychological motivation. These things don't meet the degree. That isn't only when there's a formal... Is that only when there's a formal, what do they call it, guardian appointed? Are these fine? You're saying that some things are beyond the degree and some things are not beyond the degree, right? Some kinds of things you were about to describe would be okay, even though in a sense they force labor, right? I think that, yes, there would be... In that category of things, does it matter whether it's a formal guardian? Could it be the informal guardian like I'm talking about? I think that the way the statute is written, as well as the legislative history that supports why these six laws were enacted, is that the relationship between the two is not central. It shouldn't be. Thank you. I just want to... I mentioned before this idea of a clear statement rule from cases like Cleveland. Do you agree a clear statement rule applies here when we're talking about familial relations or not? I don't. Even if there were evidence here that there was a guardianship or a... No, but the point I'm trying to make is a legal point, that when the federal Congress enters a field that the states have regulated very heavily in the past, still regulate very heavily, that Congress has to speak clearly when it's deciding to enter that field. Don't you agree that applies here, doesn't it? I do agree, Your Honor. I believe that... So that means the local parentis, familial relations issues, they've got to speak clearly when they're trying to regulate that through a forced labor statute. I believe that the legislative history does encompass... There are a lot of U.S. Supreme Court cases that say you never satisfy the clear statement rule through legislative history. So if that's all you have, that's the end of that game. I believe that the power of Congress to legislate in this area is because it deals with slavery and incidents and badges of slavery. I think that there's a broader conception in what types of conduct they're able to allow, because as we know, states did condone slavery for many years, and this is why we have, in recognizing that there are modern forms of slavery, that this statute was enacted. The plantation owners were not importing third cousins to come work on the farm. No, sometimes they were birthing them, as in Thomas Jefferson's ancestors who were also slaves, or children that worked on his plantation, who were also his own children. So I think that in that concept... Do you think local parentis doesn't apply? I think that it does apply, but there is... I think that local parentis does apply, and that it is a consideration that prosecutors do in viewing the statute. The statute, not discretion. The meaning of the statute, not your discretion. I think that it would contemplate, certainly, a situation where a parent could compel, up to the standard that's contemplated by the statute, to labor from its child. Now, that doesn't mean that this is a case that is strictly child abuse, where there's no... There's not that link, that nexus, that is expressly contemplated by the second element of the statute. The fact that there is child abuse incorporated in this federal crime, though, has not precluded other federal crimes, like child pornography, production of child pornography, which can occur very often, unfortunately, between a parent and a child. And there's... Like in those statutes, it's clear that what we're talking about is not just a federal case of child abuse. And like here, this is not... This certainly has elements of child abuse because of the force and the beatings that were used, but because the statute contemplates that specific link, that knowing compulsion of labor from a child or from another individual by one of the three means. Thank you. Thank you, Your Honor. Thank you. Your Honors, this is a child abuse case. It should have been tried in the state court, and I think the reason it was not, it was tried in the federal system, is simply because the state dropped the ball. And that is why, at the outset, we said this is the bad law, and that's because this is not a federal case. Congress makes enough laws without the need of creative application by U.S. Attorney's Offices. As for Deja Messy and some of these other cases, Deja Messy, for example, the individual worked from 6 a.m. to 10 p.m. She was literally chained in the basement, lived in the basement. Literally chained? Literally. I mean, she was basically, and was not allowed to shower with regular water. That's just one example. The other examples. Are there chains? Well, it was, maybe not literally, but she was. Locked on a door? I think so, but it was pretty bad. And cases like that, some of the other cases, these are cases where the individual is literally working from the moment they get up to the moment they go to bed. There's incidents of sexual abuse, these sorts of things. So these are the types of cases that were meant to be brought and have been brought under 1589. There's absolutely nothing. I've scoured the case law as for cases similar to this factually, and there's simply nothing. As to the facts, the children did clean the house, but they also lived there. And the children, they did do the cooking, but they also ate the food. They left the house. They went to school every day. They rode bikes. Cleaned his clothes? They cleaned his clothes. They also cleaned their clothes. It was done. Just did the laundry, in other words. Essentially, yes, precisely. So this is an instance where they were living in the basement or living in the garage or living in some hovel. What was his occupation? He had two jobs, Your Honor. He worked as a janitor at the University of Michigan. He was also a part-time tennis instructor. Part-time what? Tennis instructor. He was a former tennis pro. So he was never around, essentially. He was almost never in the house. And additionally, they had keys to the house. All these other cases, none of these facts are like this. They had a bike or multiple bikes. They had a car. He taught them how to drive. This is just simply, again, is there child abuse here? Yes. Is it bad? Yes. But that's what it is. It's child abuse. It's not forced labor. He also hired a tutor. So there's a myriad of examples where Mr. Tobiev, again, he did it in a very bad way. How did the jury come to the wrong conclusion? I don't think they had a choice, frankly. Based on the jury instructions, how labor was defined, how services was defined, there's literally nothing, and I don't have the language right in front of me, but I believe for services or labor, it was anything requiring any sort of mental exertion. So literally asking someone to pick up a pencil, that is a labor service. Again, I'll sum up. Just as we pointed out in the briefs, adopting, in counsel's questions here, discussion here today, has not disproved this. Adopting a prosecution's theory, any relationship involving domestic violence or child abuse, along with chores, is now a federal offense. And I think, as Judge Sutton's questions have suggested, this is an area of state law, and we pointed this out repeatedly. We cited in a number of cases that family relations are a traditional area of state concern, and we would ask that the Court reverse either on this issue or Miranda or the other issues cited in our brief. And if there are no further questions, I appreciate the Court's time. Thank you, counsel. Further questions? No, thank you. Thank you, Your Honor. The case will be submitted. Please call the next case.